IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

SHERN F. HUNTER                                                                                          PLAINTIFF

VS.                                                  CASE NO. 05-CV-1106

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY                                                       DEFENDANT

## MEMORANDUM OPINION

Shern Hunter has appealed the final decision of the Commissioner of the Social Security Administration, denying her claims for Disability Insurance Benefits and Supplemental Social Security Income.  Hunter applied for benefits on March 8, 2002, alleging disability due to knee impairments, carpal tunnel syndrome, thyroid dysfunction, borderline intellectual functioning, and ovarian cysts, with an onset date of October 1, 1996.  Hunter's applications were denied initially and again on reconsideration.  A hearing was held on March 24, 2004.  Hunter was not represented by counsel at this hearing.  The administrative law judge ("ALJ") concluded that, based upon Hunter's residual functional capacity ("RFC"), age, education, and work experience, there were a significant number of jobs in the national economy that she could perform.  Thus, the ALJ concluded that Hunter was not under a disability as defined by the Social Security Act.  The Appeals Council denied Hunter's request for a review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  Hunter filed a timely complaint in this Court.  Both parties have filed appeal briefs.  After careful consideration of the record as a whole, this Court finds that the decision of the Commissioner is supported by substantial evidence.

## I. STANDARD OF REVIEW

The Court's function on review is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. In assessing the substantiality of the evidence, the Court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006). This Court may not reverse the Commissioner's decision simply because substantial evidence may support the opposite conclusion. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

## II. BACKGROUND

### A. The medical evidence

Hunter was thirty-two years old as of the hearing date and had completed high school with special education classes. Hunter's primary work in the past had been a factory worker and a fast food customer service worker. Hunter testified that she is currently unable to work because of knee pain and carpal tunnel syndrome.

In April 1993, Hunter underwent arthroscopic right knee surgery. In November 1997, Dr. Charles Clark diagnosed Hunter with patellofemoral syndrome, bilaterally; meniscus tear medially on the left; and probably either an atypical or a discoid meniscus bilaterally. In December 1997, Dr. Clark noted that there might be a partial or full ACL tear and treated Hunter with Naprelan, Flexeril, and a hinged neoprene brace. In January 1998, Dr. Clark diagnosed early post-traumatic degenerative arthritis of the left knee.

From 1999 to 2001, Hunter presented to the Interfaith Clinic for problems with

hypertension, thyroid problems, and knee problems. On April 22, 2001, an X-ray showed Hunter's hip to be normal, but it was noted that there was mild degenerative changes involving Hunter's left knee. On September 17, 2001, an X-ray of Hunter's right knee was negative for fracture.

On January 14, 2002, Dr. D'Orsay D. Bryant saw Hunter for severe left knee pain. Dr. Bryant noted that Hunter was having progressive knee pain made worse with prolonged standing, walking, and bending. Dr. Bryant diagnosed Hunter with left knee patellofemoral chondrosis with possible meniscal injuries and scheduled Hunter for a left knee scope.

On February 15, 2002, Hunter underwent arthroscopic knee surgery. In 2002, Hunter continued to see Dr. Bryant for knee problems. Dr. Bryant reported that Hunter did not wish to have the knee aspirated, which would aid her in being able to exercise. He further noted that Hunter was able to walk without aids.

On November 10, 2003, Hunter had right carpal tunnel release surgery. Following the surgery, Hunter's sensations of numbness diminished but were not completely eliminated. In January 2004, Hunter underwent left carpal tunnel release surgery and experienced a decrease in symptoms of numbness. Hunter complained of some distal radioulnar joint symptoms, and Dr. Dewayne Daniels gave her a volar cockup brace.

Dr. Daniels, an orthopedic specialist, stated that Hunter had a form of achondroplastic dwarfism predisposing her to a bone and joint pathology in the hips, back, and other parts of the body. He opined that Hunter could only perform a sedentary job position where she would have the ability to change positions frequently and take frequent breaks.

On June 21, 2004, Hunter saw Dr. Sam Boyd for a psychological evaluation. Dr. Boyd

administered the WAIS-III, and Hunter scored a verbal IQ of 65, performance IQ of 79, and a full-scale IQ of 69. Dr. Boyd opined that Hunter was not attempting to give her best effort and that her scores were not valid. Dr. Boyd further opined that Hunter could understand, remember, and carry out work instructions if the tasks were simple, repetitive, and well-rehearsed. Hunter's WRAT-3 results indicated that she was reading at a fourth-grade level, spelling at a third-grade level, and doing math at a fifth-grade level. As a result, Dr. Boyd stated that Hunter would be able to use her academic skills on a most rudimentary level on the job. On the MMPI personality test, Hunter appeared to be deliberately exaggerating. The CARB indicated that Hunter gave very poor effort. Dr. Boyd diagnosed Hunter with borderline intellectual functioning and opined that Hunter was not capable of managing funds without assistance.

### B. Testimony from the hearing

Hunter testified that she worked at IDX Corporation from 1999 to 2001, making parts for casinos and car washes. According to Hunter, she started having problems with her hand in 2000, and she was diagnosed with carpal tunnel syndrome. Hunter had a child on August 31, 2001. Hunter also testified that she had previously worked for Benchmark Industry making light fixtures and for Kentucky Fried Chicken running the register.

Hunter testified that she had had two surgeries on her left knee and one surgery on her right knee. Her last surgery on her knee was in February 2002. Hunter stated that she had carpal tunnel syndrome in both hands. She had surgery on her right hand in November 2003 and on her left hand in January 2004. According to Hunter, she was not capable of filling out a job application, and she stated that someone had always filled out her job applications for her. Hunter testified that her doctor told her that she could not stand for long periods of time on a

concrete or an uneven surface. According to Hunter, she was presently taking Ibuprofen 800 and Propox.

Hunter stated that she could probably stand for an hour and a half at one time. If she then sat down for ten or fifteen minutes, she could stand up again for another hour and a half if her knee was not hurting. Hunter testified that if she sits for long periods of time, her knee locks up and begins to hurt.

The vocational expert ("VE") opined that someone with Hunter's conditions could not perform her past relevant work. The VE further opined that one such as Hunter could perform other jobs in the national economy, such as a cashier clerk or an accounts clerk. Hunter's mother testified that Hunter's knee stays swollen all the time. She also stated that Hunter took resource classes in school.

### III. DISCUSSION

In order to receive disability insurance benefits, Hunter is required to establish that she is disabled. One is disabled when he or she is unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that is expected to result in death or that has lasted or can be expected to last for a continuous period not less than twelve months. 20 C.F.R. § 404.4505. To meet this definition, one must have a severe impairment that makes him or her unable to do his or her past relevant work or any other substantial gainful work that exists in the national economy. *Id*.

The ALJ is required to apply a five-step sequential evaluation process to each claim for disability benefits; (1) whether the claimant has engaged in substantial gainful activity since filing her claim, (2) whether the claimant has a severe physical and/or mental impairment or

combination of impairments, (3) whether the impairment(s) meet or equal an impairment in the listings, (4) whether the impairment(s) prevent the claimant from doing past relevant work, and (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  *See* 20 C.F.R. § 404.1520 (2006).

Here, the ALJ found that Hunter had not engaged in substantial gainful activity since her alleged onset date and acknowledged that Hunter's arthritic knee pain, carpal tunnel syndrome, and borderline intellectual functioning were severe impairments.  The ALJ further found that Hunter did not have a listed impairment or an impairment equal to one of the listed impairments.

The ALJ determined that Hunter retained the RFC for a broad range of light work activity that involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  The ALJ found that Hunter is capable of standing and/or walking with normal breaks for a total of six hours in an eight-hour workday, is capable of sitting with normal breaks for six hours per workday, and is capable of some pushing and pulling of arm and leg controls   The ALJ stated that Hunter would have to avoid light work that involved extensive walking or standing or extensive use of leg controls.  The ALJ also determined that Hunter could perform simple, unskilled or semi-skilled tasks; that she could understand, follow, and remember concrete instructions; and that she experiences no restriction interacting with co-workers, supervisors, and the general public.  The ALJ found that Hunter could not return to her past work but that there were a significant number of other jobs in the national economy that Hunter could perform.

Hunter argues that the ALJ's decision that she is not disabled is not supported by substantial evidence for the following reasons:  (1) the ALJ improperly evaluated Hunter's

mental impairment, (2) the ALJ erred in discrediting Hunter's subjective complaints of pain, (3) the ALJ did not properly determine Hunter's RFC, and (4) the ALJ erred in finding that Hunter had the RFC to perform other jobs in the national economy.

This Court will now address Hunter's first argument. Hunter asserts that the ALJ improperly evaluated Hunter's mental impairment. To determine the severity of a claimant's mental impairment, the ALJ must assess the degree of the claimant's functional limitation resulting from that impairment. 20 C.F.R. § 404.1520a(b)(2). The ALJ is required to rate the degree of a claimant's functional limitations in four broad categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). If the ALJ rates the claimant's degree of limitation in the first three functional areas as "none" or "mild" and the fourth area as "none," it is generally concluded that the claimant's mental impairment is "not severe." *See* 20 C.F.R. § 404.1520a(d)(1).

Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, and using a post office. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1). Social functioning refers to one's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2). "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3). "Episodes of decompensation are exacerbations or temporary increases in

symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).

Dr. Boyd, a psychologist, examined Hunter on June 10, 2004. Dr. Boyd noted that Hunter cared for her two-year old daughter, helped her mother on the farm, and went fishing. Dr. Boyd further noted that Hunter was able to maintain her own hygiene and grooming, perform household chores, cook, and shop for household and personal needs. Hunter indicated that she had friends that she visited occasionally, and Dr. Boyd concluded that Hunter showed a mild degree of social withdrawal. Dr. Boyd opined that Hunter had no problems with concentration, persistence, and pace. Dr. Boyd concluded that Hunter was able to understand, remember, and carry out work instructions only if the tasks involved were simple, repetitive, and well-rehearsed.

Based on Dr. Boyd's assessment, the ALJ concluded that Hunter had mild restrictions of activities of living; no difficulties maintaining social relationships; mild deficiencies of concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. According to this assessment, the regulations refer to Hunter's mental impairments as "not severe." *See* 20 C.F.R. § 404.1520a(d)(1). The ALJ further concluded that Hunter could perform simple, unskilled, or semi-skilled tasks and that she could understand, follow, and remember concrete instructions. The ALJ found that Hunter had no problems interacting with co-workers, supervisors, and the general public and that the nature and extent of her borderline intellectual functioning symptoms cause no limitation in the ability to perform basic work activities.

Hunter argues that the ALJ erroneously determined that her borderline intellectual

functioning was a non-severe impairment that caused no functional restrictions. "While borderline intellectual functioning may not rise to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with [her] other impairments to determine how it impacts upon the claimant's residual functional capacity." *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996).  Here, the ALJ noted in its findings of fact that the medical evidence established that Hunter had borderline intellectual functioning.  The ALJ specifically mentioned Hunter's borderline intellectual functioning in his hypothetical to the vocational expert.  It is clear that the ALJ did not ignore Hunter's borderline intellectual functioning and that the vocational expert considered it along with Hunter's other impairments to determine how it impacted her residual functional capacity.  Moreover, the ALJ's assessment of Hunter's mental limitations as "not severe" is consistent with the general assessment found in 20 C.F.R. § 404.1520a(d)(1).  Thus, the ALJ properly evaluated Hunter's mental impairment.

Turning now to Hunter's second argument for reversal, she asserts that the ALJ erred in discrediting her subjective complaints of pain.  The ALJ is required to consider all the evidence relating to Hunter's subjective complaints, including evidence presented by third parties that relates to the following:  (1) Hunter's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where

9

inconsistencies appear in the record as a whole. *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003). The ALJ must make an express credibility determination that explains, based on the record as a whole, why claims were found to be not credible. *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006). Credibility findings are for the ALJ to make when the findings are adequately explained and supported. *Id*. This Court will not find error where the ALJ considered, but discredited for good cause, a claimant's complaints of pain. *Brown*, 390 F.3d at 541. Inconsistencies between a claimant's complaints and the record as a whole are a valid basis from which to make assessments regarding both credibility and the severity of symptoms and/or impairments. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997).

   Here, the ALJ discredited Hunter's testimony regarding the extent of her pain. The ALJ considered Hunter's daily activities, such as Hunter's ability to shop for groceries and clothes, care for her personal needs, use public transportation, and care for her child. Hunter reported to Dr. Boyd that she could care for her daily needs, perform household tasks, cook, shop, and take prescribed medications. The record also indicated that Hunter helps her mother on the farm. The ALJ noted that Hunter's pain is aggravated by standing and that Hunter reportedly used Ibuprofen, Tylenol, Propox, and Norvase. According to Hunter, she took these medications without any adverse side effects.

   Dr. Boyd opined that Hunter was malingering and providing poor efforts on her diagnostic testes. Hunter's own treating physician indicated that Hunter was capable of performing sedentary work. Dr. Daniels opined that Hunter was able to perform sedentary work that provided her the opportunity to change positions frequently and to take frequent breaks.

   Hunter's impairments can be expected to cause her pain, but the real issue is how severe

the pain is and whether it prevents her from performing any kind of work. *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996). The ALJ credited Hunter's complaints of pain to some degree when it found that Hunter's functional capacity was limited to less than the full range of sedentary work. The ALJ, however, found that the objective medical evidence and Hunter's own description of her daily activities were inconsistent with her complaints of disabling pain.

The ALJ considered the testimony of Hunter's mother that Hunter experienced disabling pain. The ALJ properly discounted this testimony, noting that it was motivated, to some degree, by a desire to see her daughter obtain disability benefits. *See Hall v. Chater*, 109 F.3d 155, 1258 (8th Cir. 1997) (finding that the testimony of claimant's witnesses was not credible because the witnesses were motivated in part by their desire to see the claimant receive benefits).

Here, the ALJ considered but properly discredited for good cause Hunter's complaints of disabling pain. The ALJ cited the *Polaski* factors and detailed the relevant evidence. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that when the ALJ discredits the claimant's credibility and gives a good reason for doing so, the court will defer to his judgment even if every factor is not discussed in depth). While Hunter may suffer from some degree of pain, the record as a whole does not support her subjective complaints of disabling pain. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that the fact that working may cause pain or discomfort does not mandate a finding of disability). The ALJ properly cited to inconsistencies in the record combined with the lack of supporting objective medical evidence as reasons for discrediting Hunter's testimony regarding the extent of her pain. Thus, the ALJ properly assessed Hunter's subjective complaints of pain.

Third, Hunter argues that the ALJ did not properly determine her RFC. "When

determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).  A claimant's RFC is the most she is able to do despite her limitations.  20 C.F.R. § 404.1545(a).  The ALJ bears the primary responsibility for determining residual functional capacity.  The determination, however, remains a medical question, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in a workplace.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002). The ALJ must determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  *Baldwin*, 349 F.3d at 556.

 Here, the ALJ's analysis of Hunter's RFC is supported by the record.  The ALJ relied on Dr. Daniels's opinion that Hunter could engage in sedentary work if she were allowed to change positions frequently and take breaks frequently.  Dr. Daniels, an orthopaedic specialist, was Hunter's treating physician.  The opinion of a treating physician controls "if it is well-supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

 The ALJ relied on Dr. Boyd's opinion regarding Hunter's borderline intellectual functioning.  Dr Boyd noted that Hunter spent her days caring for her two-year-old child, helping her mother on the farm, and going fishing.  Dr. Boyd also noted that Hunter could maintain her own hygiene and grooming, perform household chores, cook, and shop for her household and personal needs.  Dr. Boyd indicated that Hunter had friends who she visited regularly and had no problems with concentration, persistence, and pace.  It was Dr. Boyd's conclusion that Hunter

12

could understand, remember, and carry out work instructions if the tasks involved were simple, repetitive, and well-rehearsed. No other objective physical evidence contradicts Dr. Boyd's assessment.

Hunter argues that the ALJ relied on his own lay opinion as to Hunter's physical and mental capacities and should have ordered a consultative physical and psychological evaluation of Hunter to properly assess her function in the workplace. This argument is without merit. It was at the ALJ's request that Hunter was examined by Dr. Boyd. Dr. Daniels, who expressed a general opinion as to Hunter's physical RFC, was Hunter's own treating physician. The ALJ properly relied on evidence in the record to determine both Hunter's mental and physical RFC. *See Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001) (stating that the ALJ is permitted to issue a decision without obtaining additional evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.).

Finally, Hunter argues that the ALJ erred when it found that Hunter had the RFC to perform other jobs in the national economy. Specifically, Hunter asserts that the hypothetical that the ALJ relied on is flawed. The ALJ found Hunter incapable of performing her past relevant work, so the burden shifted to the Commissioner to show that she could perform a significant number of jobs in the national economy. *Gray v. Apfel*, 193 F.3d 799, 802 (8th Cir. 1999).

In his first and second hypothetical questions, the ALJ asked the VE to assume an individual with the same age, vocational background, and educational background as Hunter. The ALJ further explained that this individual experienced mild to moderate pain with the use of medication; that she could lift and/or carry no more than ten pounds and reach and handle within

13

those limitations; that she could sit for six hours in an eight-hour workday and for one to two hours without interruption; that she would require the ability to adjust in her seat and take breaks after one to two hours; that she could stand/walk for two hours in an eight-hour workday on level surfaces; that she could never perform repetitive or constant manipulative tasks; and that she could occasionally climb, crouch, kneel, crawl, and stoop.  The ALJ also explained that, from a non-exertional standpoint, the individual could perform simple, unskilled or semi-skilled tasks; that she could understand, follow, and remember concrete instructions; and that she experienced no restriction interacting with co-workers, supervisors, and the general public.

The VE responded that, although the hypothetical individual could not return to Hunter's past relevant work, there were jobs in the national economy that this individual could perform. The VE indicated that the individual could work as an order clerk and as a charge account clerk.

Hunter argues that the ALJ's hypothetical question to the VE failed to adequately describe the consequences of Hunter's deficiencies.  An ALJ must include in his hypothetical question all the impairments he finds that are supported by the record.  *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999).  The ALJ largely based his findings regarding Hunter's RFC on the opinions of Dr. Daniels, Hunter's treating physician, and Dr. Boyd, who has examined Hunter. As noted above, the ALJ included all the impairments in the hypothetical questions that he found to be supported by the record, and this Court has already concluded that the ALJ's findings regarding Hunter's impairments or her RFC are supported by substantial evidence in the record.

## IV. CONCLUSION

For the foregoing reasons, having carefully reviewed the record, this Court finds that substantial evidence supports the ALJ's decision denying benefits to Hunter. The ALJ's decision is affirmed. This Court further finds that Hunter's complaint should be dismissed with prejudice.

Dated this 7th day of February 2007.

      /s/ Harry F. Barnes

Hon. Harry F. Barnes
United States District Judge